O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANNY R., | Case No. 5:18-cv-01992-KES |
| Plaintiff, | |
| v. | MEMORANDUM OPINION AND ORDER |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1] | |
| Defendant. | |

**I.**

**BACKGROUND**

Plaintiff Danny R. ("Plaintiff") applied for Supplemental Security Income disability benefits on August 2, 2014, alleging disability commencing January 1, 2012, when he was 46 years old. Administrative Record ("AR") 172-76. An Administrative Law Judge ("ALJ") conducted a hearing on July 10, 2017, at which

---

[1] Effective November 17, 2017, Ms. Berryhill's title is "Deputy Commissioner for Operations, performing the duties and functions not reserved to the Commissioner of Social Security."

1

Plaintiff, who was represented by an attorney, appeared and testified, as did a vocational expert ("VE"). AR 59-83.

On August 25, 2017, the ALJ issued an unfavorable decision. AR 13-29. The ALJ found that Plaintiff suffered from severe impairments of "peripheral neuropathy, cholecystitis, osteoarthritis in bilateral hands, and schizoaffective disorder." AR 18. Despite these impairments, the ALJ found that Plaintiff had a residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 416.967(b) with some additional manipulative, postural, and mental restrictions, including the following: "Assigned work must be limited to simple tasks learned in 30 days or less or by brief demonstration. The assigned tasks must have minimal change in the tasks as assigned and require less than occasional (little to no) travel to unfamiliar places." AR 21.

Based on the RFC and the VE's testimony, the ALJ found that Plaintiff could not do his past relevant work (which included working as an industrial truck operator, auto detailer, and landscaper), but he could work as a cashier (Dictionary of Occupational Titles ["DOT"] 211.462-010), electronics worker (DOT 726.687-010), and mail clerk (DOT 209.687-026). AR 23-25. The ALJ concluded that Plaintiff was not disabled. AR 25.

## II.
## ISSUES PRESENTED

Issue One: Whether the ALJ erred in (a) rejecting the opinion of treating physician Dr. Linda Lay (AR 413-14), or (b) formulating the mental demands of Plaintiff's RFC.

Issue Two: Whether the ALJ erred in concluding that Plaintiff was capable of doing "light" work.

Issue Three: Whether the ALJ erred in relying on the VE's testimony to conclude that Plaintiff could work as a cashier, electronics worker, and mail clerk. (See Dkt. 25, Joint Stipulation ["JS"] at 4-5.)

**III.**

**DISCUSSION**

For the reasons discussed below, the ALJ erred as to Issue One, and remand for further administrative proceedings is appropriate. However, this Opinion discusses all of the issues raised by Plaintiff because the Court believes that discussion will help guide the ALJ during proceedings on remand. For ease of discussion, the Court addresses Issues Two and Three first, then turns to Issue One.

A. <u>ISSUE TWO: Light Work.</u>

    1. **Relevant Administrative Proceedings and Legal Standards.**

The ALJ gave "great" weight to the opinions of state agency consultants Drs. Hughes and Jacobs concerning Plaintiff's physical impairments. AR 22. Dr. Hughes found that Plaintiff could "stand and/or walk" about six hours in and eight-hour workday with normal breaks. AR 93. Dr. Hughes commented that Plaintiff's impairments would preclude "constant standing and walking" but he "would be capable of standing and walking for six hours with routine breaks." AR 95. These limitations were found consistent with "light" work. AR 96. Dr. Jacobs agreed. AR 106-09.

The ALJ's initial hypothetical question to the VE did not specify an exertional level or a limit on standing/walking. AR 77-78. The ALJ then clarified that the hypothetical worker was limited to "light exertional" work. <u>Id</u>. The VE identified three jobs rated as "light" by the DOT: cashier (DOT 211.462-010), electronics worker (DOT 726.687-010), and mail clerk (DOT 209.687-026). AR 81-82.

The ALJ's RFC determination refers to "light work as defined by 20 C.F.R. § 416.967(b)" but does not otherwise specify a limit on standing or walking. AR 21. The cited regulation defines light work as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.

> Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. …

20 C.F.R. § 416.967(b) (2017).[2] Social Security Rule ("SSR") 83-10 further defines "light" work as follows:

> 2. Light work. The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing -- the primary difference between sedentary and most light jobs. …
>
> "Frequent" means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk.

SSR 83-10, 1983 SSR LEXIS 30, 1983 WL 31251 (Jan. 1, 1983).

**2. Analysis of Claimed Error.**

Plaintiff contends that by limiting him to "light" work, the ALJ did not

---

[2] The Court applies the version of the regulations in effect when the ALJ's decision was issued on August 30, 2017. AR 25. The definition of light work has not changed in relevant part.

effectively limit him to walking or standing for six hours/day and did not give any reason for rejecting the opinions of Drs. Hughes and Jacobs that he could only walk or stand for six hours/day. According to Plaintiff, since "light" work requires walking or standing during two-thirds of the workday (i.e., for six hours) to accomplish "frequent" lifting/carrying, and sitting is only "intermittent" during the remaining third of the workday, then light work logically requires *more* than six hours of walking/standing. (JS at 17-22.)

Courts, however, have generally interpreted the above-cited authorities as establishing that "light" work is consistent with a limitation to standing or walking for six hours/day. See, e.g., Holman v. Shalala, 42 F.3d 1400, 1994 U.S. App. LEXIS 32748, at *7, 1994 WL 650059, at *2 (9th Cir. 1994) (table) ("Light work requires six hours of standing or walking…."); Jenkins v. Astrue, 628 F. Supp. 2d 1140, 1149 (C.D. Cal. 2009) ("the ability to perform the full range of light work … requires standing or walking for six hours in an eight-hour day"); Rakowski v. Comm'r of Soc. Sec., No. 16-00588, 2017 U.S. Dist. LEXIS 123736, at *28, 2017 WL 3334010 at *11 (E.D. Cal. Aug. 4, 2017) (collecting cases holding same).

Thus, in finding that Plaintiff could do "light" work, the ALJ did not "reject" the opinions of Drs. Hughes and Jacobs. Plaintiff is not entitled to relief on Issue Two.

**B.     ISSUE THREE: Vocational Testimony.**

    **1.     Simple Work and the Cashier and Mail Clerk Positions.**

The ALJ limited Plaintiff to "simple tasks." AR 21. A limitation to simple, repetitive tasks conflicts with doing work rated by the DOT as requiring reasoning level 3. Zavalin v. Colvin, 778 F.3d 842, 847 (9th Cir. 2015). The DOT rates the jobs of cashier and mail clerk as requiring reasoning level 3. DOT 211.462-010 and 209.687-026. The ALJ therefore erred in failing to ask the VE about this apparent conflict between his testimony and the DOT before concluding that Plaintiff could work as a cashier or mail clerk. SSR 00-4p, 2000 SSR LEXIS 8,

2000 WL 1898704 (Dec. 4, 2000) ("[B]efore relying on VE … evidence to support a disability determination or decision, [ALJs] must: [1] Identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs … and information in the … DOT … and [2] Explain in the determination or decision how any conflict that has been identified was resolved.").

Defendant argues that any error was harmless because the electronics worker position (DOT 726.687-010) only requires level 2 reasoning and the VE testified that there were 206,000 such jobs in the national economy (AR 81), which is sufficiently numerous to constitute a significant number of jobs. (JS at 37).

**2. The Electronics Worker Position.**

The DOT classifies this job under the category of jobs involving assembly and repair of electronic equipment. Typical tasks include cleaning and preparing components for assembly, trimming molded parts, applying coatings, cutting wires, fastening components together, and moving parts around a production facility. DOT 726.687-010.

Plaintiff argues that the ALJ erred in finding that he could work as an electronics worker because that job requires (1) a high school degree, which he does not have, and (2) training in excess of the limits in his RFC. (JS at 26-32.) He also argues that the VE's testimony concerning the number of available jobs is unreliable. (JS at 34.)

    a. Educational Requirements.

The ALJ asked the VE to assume that the hypothetical individual had the same educational background as Plaintiff.³ AR 77. The VE testified that such an individual could work as an electronics worker. AR 81. This testimony could not

---

³ Plaintiff testified that he attended high school up to 10th grade, but he never obtained a degree or GED. AR 64. He testified that he cannot read or write and never received a driver's license. Id.; AR 212, 215 (someone else completed his Function Report and stated that Plaintiff "can't hardly read").

conflict with the DOT, because the DOT does not state whether a high school degree is required for each listed job.

Another reference publication, the Occupational Outlook Handbook ("OOH"), lists "high school diploma or equivalent" as the "typical" educational requirement for entry-level positions for production workers, a group that would include electronics workers. (JS at 27-28.) The Commissioner "will take administrative notice" of job information from the OOH. 20 C.F.R. § 416.966(d)(5). Plaintiff argues that this regulation means that the ALJ was compelled to ask the VE if his testimony conflicted with the OOH, or that the ALJ's finding that Plaintiff could work as an electronics worker lacks substantial evidentiary support because it conflicts with the OOH. (JS at 31-32.)

In Shaibi v. Berryhill, 883 F.3d 1102 (9th Cir. 2017), the claimant argued that the ALJ was required to resolve an alleged conflict between the VE's testimony regarding the number of jobs existing in the national economy and the job numbers set forth in other sources, including the OOH. Id. at 1108. The Ninth Circuit held that the ALJ was only required to explore conflicts between the VE's testimony and the DOT. Although the OOH was "listed in 20 C.F.R. § 404.1566(d) as [a] data source[] of which the Social Security Administration 'will take administrative notice[,]' [i]t does not follow that an ALJ must in every case reconcile conflicts sua sponte between … [the OOH] and the VE's testimony. That requirement was established in SSR 00-4p … only for the DOT and an associated document." Id. at 1109, n. 6. The panel's rationale – that there is "no case, regulation or statute suggesting that an ALJ must sua sponte take administrative notice of [job numbers] in the … OOH" and the claimant has "cite[d] to [none]" – applies equally to the education requirements at issue here. Id. at 1109.

Further, because the ALJ had no independent duty to consider the existence of conflict between the OOH and the VE's testimony, Plaintiff was required to

7

raise the issue at the administrative hearing. Plaintiff could have cross-examined the VE concerning the alleged conflicts between his educational background and the OOH, but he did not. AR 82-83. The failure to do so means that the issue is now waived. See Shaibi, 883 F.3d at 1109 ("[W]hen a claimant fails entirely to challenge a [VE's] job numbers during administrative proceedings before the agency, the claimant forfeits such a challenge on appeal, at least when the claimant is represented by counsel."); Gonzalez v. Berryhill, No. 17-5402-E, 2018 U.S. Dist. LEXIS 7590, at *5-6, 2018 WL 456130, at *2 (C.D. Cal. Jan. 17, 2018) (collecting cases holding that the "waiver rule established in Shaibi applies not only to arguments concerning conflicts in the numbers of jobs, but also to arguments concerning other conflicts between [VE] testimony and information contained in non-DOT vocational sources"; finding plaintiff waived the argument, based on the OOH, that the occupation at issue required a higher level of education).

      b.     Training Requirements.

The DOT rates the electronics worker job as having a specific vocational preparation ("SVP") of 2. SVP levels are defined in the DOT as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Bray v. Comm'r of SSA, 554 F.3d 1219, 1230 n.4 (9th Cir. 2009) (quoting DOT Appendix C, page 1009 (4th ed. 1991)). SVP 2 means "anything beyond a short demonstration up to and including 1 month." DOT 726.687-010.

Thus, the VE's testimony was consistent with the DOT, and the ALJ was entitled to rely on it to find that the training requirements for the electronics worker job were consistent with Plaintiff's RFC. Plaintiff's arguments to the contrary fail for the same reasons stated in the "Educational Requirements" section above.

c.      Job Numbers.

Plaintiff argues that the VE's testimony that there are 206,000 electronics worker jobs available came from the 2013 Occupational Employment Statistics. (JS at 34.) According to Plaintiff, this testimony overstated the real number, because (1) it is from 2013, and the OOH rates production worker jobs as having a "slower than average" growth rate, and (2) it applies to the whole range of production workers, not just electronics workers. (JS at 28-34.) As a result of the overstatement, Plaintiff argues, the ALJ's finding of 206,000 available jobs (AR 25) lacks substantial evidentiary support.

Plaintiff's counsel raised none of this at the hearing where the VE could have addressed it. Plaintiff argues that this did not create a waiver, because the number of electronics workers jobs was not critical until the Court found that the two other suggested jobs, as described by the DOT, conflicted with Plaintiff's RFC. (JS at 34-35.) Plaintiff relies on Lemauga v. Berryhill, 686 Fed. App'x 420 (9th Cir. Apr. 3, 2017), which found that claimant had not waived her challenge to job numbers by failing to raise the issue at the ALJ hearing because: (a) at the ALJ hearing, the parties assumed that the claimant could perform three jobs, which together clearly were presented in significant numbers; (b) on appeal, the Commissioner conceded that two of these jobs were inconsistent with the claimant's RFC, giving increased relevance to the significance of the job numbers for the third job; and (c) analyzing the significance of the job numbers was part of the court's harmless error analysis. Id. at 421-22 n.1.

However, the unpublished decision in Lemauga predates Shaibi. The Shaibi opinion cited Lemauga and other cases, and then noted that the Ninth Circuit had "issued no ***precedential*** opinion concerning *when* a Social Security claimant must, absent a showing of good cause, challenge the evidentiary basis of a [VE's] job numbers to preserve the issue for litigation in the district court." 883 F.3d at 1108-09 (bolded emphasis added). Shaibi's holding that a claimant must at least "raise

9

the job-numbers issue in a general sense before the ALJ," even if the claimant is not "in a position to anticipate the particular occupations and VE might list and the corresponding job numbers," id. at 1110, is inconsistent with Lemauga and implicitly overruled Lemauga.

C.     **ISSUE ONE: Dr. Lay and Plaintiff's Mental Impairments.**

   1.   **Summary of Relevant Evidence.**

        a.   State Agency Physicians.

After Plaintiff applied for benefits, the state agency arranged for a psychiatric evaluation in December 2014; Plaintiff failed to appear. AR 283. Plaintiff also failed to appear at the internal medicine evaluation. AR 284. (See also JS at 6.) The state agency medical consultants—on initial determination in March 2015 and upon reconsideration in June 2015—did not list any mental impairments. AR 91-92, 105-06.

        b.   Medical Records from 2014 and 2015.

Plaintiff's doctors noted no abnormal psychological symptoms in March, April, and June 2014, and February 2015. AR 360, 389-93, 396.

In early 2015, he spent time in prison.[4] AR 399 (medical record noting that Plaintiff "just recently got out of prison on 2/15"). In September 2015, Plaintiff visited the emergency room ("ER") of the Community Hospital of San Bernardino ("CHSB") complaining of anxiety. AR 492. He had "severe" symptoms after being "kicked out of his sister's home." Id. He was prescribed Ativan for anxiety and discharged with instructions to follow up with his primary care provider. AR 494.

Plaintiff visited the CHSB ER twice more in 2015 for physical problems and did not report mental health symptoms. AR 483-84, 488. He was observed to

---

    [4] In 2016, Plaintiff told doctors that he "has been to jail several times for destroying government property." AR 523.

have "normal judgment" and "appropriate mood and affect," but he was also noted to be a "poor historian." AR 485, 489.

          c.        Medical Records from 2016 and 2017.

Records from CHSB (AR 424-94) and Arrowhead Regional Medical Center ("Arrowhead") (AR 495-570) show that, in 2016 and 2017, Plaintiff sought treatment for and was hospitalized multiple times for mental health crises.

The first hospitalization was March 5-7, 2016, when Plaintiff was voluntarily admitted for depression with "methamphetamine and marijuana abuse." AR 481. After he was "stabilized on Zoloft," he was observed to have "fair" insight, judgment, and impulse control. Id. He was instructed to follow up with the outpatient mental health clinic, Phoenix Clinic. Id.

On April 20, 2016, Linda Lay, DO, of the Phoenix Clinic completed a questionnaire about Plaintiff's ability to do work-related mental activities. AR 413-14; see also AR 540-41 (noting referral to Arrowhead from Dr. Lay at the Phoenix Clinic). The check-the-box form allowed her to rate Plaintiff's abilities as: "unlimited or very good"; "limited but satisfactory"; "seriously limited, but not precluded"; "unable to meet competitive standards"; or "no useful ability to function." AR 413-14. As to each ability, she indicated Plaintiff's ability was either "limited but satisfactory" or "seriously limited, but not precluded." Id.

Of particular relevance to his ability to maintain substantial gainful activity, Dr. Lay opined that Plaintiff's abilities in the following areas were "seriously limited": (a) maintaining attention for 2-hour segments, (b) sustaining an ordinary routine without special supervision, (c) completing a normal workday or work week without interruption from psychologically based symptoms, and (d) accepting instructions and responding appropriately to criticism from supervisors. Id. She rated as "limited but satisfactory" his abilities to: (a) carry out very short and simple instructions, (b) maintain regular attendance, (c) get along with coworkers, and (d) interact with the public. Id. The form asked her to explain

11

her "seriously limited" ratings, but she left that section blank. AR 414. She estimated that Plaintiff would miss about 4 days of work per month. Id.

The second hospitalization was on May 11-21, 2016. AR 548. Dr. Lay found that Plaintiff was a danger to himself and referred him to Arrowhead for a psychiatric evaluation . AR 531, 540-41. Plaintiff reported that he had tried to hang himself over the weekend and was increasingly depressed by his sister's decision to evict him and seek a restraining order. AR 540. He also reported a "command auditory hallucination of his deceased mother telling him to kill himself," which he thought "was possibly from not being able to sleep." Id. He had recently been prescribed Seroquel for insomnia and was taking it, but he had not filled a newly increased prescription for sertraline (the generic name for Zoloft). Id. The examining doctor at Arrowhead, Dr. Pham, determined that he was a danger to himself, prescribed sertraline and Seroquel, and admitted him for stabilization. AR 541. His lab results were positive for amphetamines and marijuana. AR 548.

On May 25, 2016, four days after his discharge from Arrowhead, Plaintiff visited the CHSB ER seeking treatment for depression. AR 477. He reported suffering from depression for 4-5 years. Id. The ER staff noted that his symptoms were "minimal," that he was not suicidal, and that he was compliant with his medications (none of which were for mental health conditions). AR 477-78. He did, however, present with a depressed mood and "abnormal/ psychotic thoughts." AR 479. He was prescribed sertraline. AR 478. He was evaluated by "tele psych" and deemed "safe to discharge." Id.

Plaintiff was hospitalized for a third time as a danger to self on May 29-June 4, 2016. AR 474. The hospital noted "noncompliance and substance abuse" as precipitating factors, but did not explain the "noncompliance" comment or list his then-prescribed medications. Id. He was diagnosed with major depressive disorder, amphetamine abuse, cannabinoid abuse, and alcohol abuse, and he was

12

"started on Saphris, Benadryl, and Zoloft." AR 475. He "slowly" responded to treatment until he was stable enough to be discharged with social worker support. Id.

Plaintiff was hospitalized for a fourth time on June 20-24, 2016. AR 467. He reported to the CHSB ER that he had auditory hallucinations, suicidal ideation, and "want[ed] to overdose on his medication." AR 469. The ER staff nevertheless observed that he was "calm and cooperative" and "in no visible distress." AR 469. He said he had "been on the street" and had not taken his medication "in the last few days." AR 469, 472. The hospital again diagnosed depression and methamphetamine dependence. Id. After he was "stabilized on Saphris," he was discharged and instructed again to visit the outpatient clinic. AR 467.

Plaintiff returned to the CHSB ER nine days later, and he was hospitalized for a fifth time from June 29-July 5, 2016. He complained of suicidal thoughts and "hear[ing] voices." AR 461. He reported being off his psychiatric medications for 3 days because he ran out. AR 461, 465. He was admitted and given Seroquel, Zoloft, and hydroxyzine. Id. He was diagnosed with bipolar disorder and borderline personality disorder trait. AR 459. On discharge, he was assessed as having "limited" insight, "fair" memory and concentration, and linear thought process. AR 459. He was only prescribed a 15-day supply of medications and instructed to follow up with the outpatient clinic. AR 459-60.

Plaintiff was admitted to the hospital for a sixth time from July 26-August 1, 2016. AR 517. His admitting diagnosis was "major depressive disorder with recurrent severe and psychotic features." AR 517, 524. He presented as "disheveled and dirty" with mumbling speech, no teeth, auditory hallucinations, and impaired judgment. AR 524, 529. He reported "suicidal ideation with the plan to hang himself or to overdose on unspecified medication" and "positive command auditory hallucinations telling him to hurt himself." AR 523. He reported that he had been off his medications "for several weeks" because they were at his sister's

house and she had evicted him. AR 517. He was discharged after he was observed to be "calm" and "cooperative" and denied any hallucinations or suicidal ideation. Id. He reported that he had three sisters and would "go to one of his sister's homes." Id.

Plaintiff was admitted to CHSB's psychiatric ward for the seventh time between August 10-19, 2016. AR 447, 456. He reported to the ER that he had been hearing voices for 8 days telling him to kill himself. AR 447. He admitted being "off medications," and he tested positive for cannabinoid use. Id. He reported that he "live[d] at home" but had "lost his meds." AR 451-52.

It appears Plaintiff did not receive any mental health treatment for nearly 5 months after being discharged in August 2016. However, he was hospitalized for the eighth time on January 3-8, 2017 as a danger to self with "severe" symptoms. AR 424. He reported to the CHSB ER that he had been hearing voices for three months and had suicidal ideations. AR 427. The hospital noted "noncompliance" and amphetamine and cannabis use. AR 424; AR 427 ("Pt has been off his medications x months."); AR 435 ("history of hearing voices due to methamphetamine use"). At the time, he was homeless. AR 435. Although it was two days after the New Year's Day holiday, he told doctors that he did not know what month it was. AR 436. He was treated with Risperdal and Zoloft. AR 425. Upon discharge, he was working with a social worker to receive additional support. AR 424.

About a week later, on January 14, 2017, Plaintiff was brought to Arrowhead for a psychiatric evaluation after he "called 911," "threatening to run into the traffic" and "jump off the bridge." AR 506. His symptoms were "severe" and "acute" including suicidal ideation. AR 495. He was "yelling, screaming, [and] cursing" and deemed a danger to self and others. AR 506. He presented with hostility and paranoid delusions. AR 510. He was admitted to the behavioral health unit on a 72-hour suicide hold. AR 499.

Plaintiff reported that he had been "off medication for a few months." AR 506, 513. He was prescribed more medications. AR 506. He was still homeless at that time. AR 506, 508. His doctor assessed that he was "unable/unwilling to comply with medication schedule without repeated prompting," was "unable to provide basic self care" such as "acquiring medication," and was "unable to understand [the] seriousness of [his mental] illness [and the] need for treatment…." AR 511.

He was discharged on January 18, 2017. AR 513. The discharge examiner noted that Plaintiff had "improved," that there "were no problems between [Plaintiff] and staff or between [Plaintiff] and other patients," and that he no longer felt suicidal or experienced hallucinations. Id. He was given a 14-day supply of medication, a list of homeless shelters, and instructions to follow up at Phoenix Clinic. Id. He was "advised to avoid alcohol and narcotics as they may worsen his underlying mood disorder." Id.

          d.       Other Submissions in Support of Benefits Application.

At the hearing before the ALJ on July 10, 2017, when asked why he could not work, Plaintiff did not mention his mental health. AR 67. He testified that he was taking mental health medication and smoking marijuana to treat his pain. AR 68. He described physical and emotional abuse during his childhood that caused him to feel depressed and suicidal. AR 71-72 (testifying that his mother "had [his] brother hit [him] in the face with pipe" and "hit [him] in the head with a shovel," and that his brother "stabbed [him] six times, shot [him] once, [and] tried to burn [him]"); see also AR 495 (January 2017 medical record noting, "Facial surgery status post assault, stab wound"). He reported that he tried to hang himself and overdose on Benadryl during the May-June 2016 period, which is consistent with what he told his medical providers during that period. AR 72, 456, 544. He testified that he saw a therapist "maybe, once a month," and he wanted additional mental health therapy but lacked transportation. AR 73. He reported that his

grandmother, with whom he lived, helped him manage his medications and activities. AR 73-74.

In his Function Report, he stated that he enjoyed watching movies on TV "all through the day." AR 212. He would take someone with him to medical appointments because he could not understand the paperwork. AR 212. He reported impairments in remembering, concentrating, understanding, following instructions, and getting along with others. AR 213. He attributed some of his mental impairments to being hit in the face with a pipe by his brother in the 1990s. AR 71, 215, 393.

### 2. The ALJ's Analysis of the Medical Evidence.

The ALJ found that Plaintiff suffers from schizoaffective disorder. AR 18. She also found that Plaintiff was mildly limited in social interactions and moderately limited in the other three functional areas affected by mental illness: (1) understanding, remembering, or applying information, (2) maintaining concentration, persistence, or pace, and (3) managing or adapting himself. AR 20.

The ALJ summarized some of Plaintiff's hospitalization records for mental health issues. AR 22-23. The ALJ characterized the records as showing that the exacerbation of his symptoms was due to "chemical dependence and noncompliance with psychiatric medications," and that his symptoms "showed significant improvement" by the time of discharge. AR 23. She concluded, "This evidence strongly suggests these symptoms with proper medication adherence are not as severe as alleged." Id.

Because the state agency consultants only addressed Plaintiff's physical impairments and Plaintiff did not attend the scheduled psychological consultative examination, Dr. Lay is the only medical source who offered opinions about how Plaintiff's mental illness affected his functional abilities. Nevertheless, the ALJ gave "little weight" to Dr. Lay's questionnaire. Id. As reasons for discounting it, the ALJ explained that (1) Dr. Lay did not support her "conclusory opinions with

relevant evidence from the treatment notes," (2) it was "unclear" whether Dr. Lay had a long treating relationship with Plaintiff, and (3) Plaintiff's symptoms when he interacted with Dr. Lay were the result of his noncompliance with his prescribed treatment. Id.

### 3. Analysis of Claimed Errors.

#### a. Dr. Lay.

ALJs must consider the following factors in deciding how much weight to give medical opinion evidence: (1) the length and nature of the medical source's relationship with the patient, (2) whether the medical source identified supporting medical signs and laboratory findings, (3) whether the opinion is consistent with other evidence in the record, and (4) the medical source's specialization. 20 CFR § 416.927; SSR 96-2p, 1996 WL 374188 (July 2, 1996). ALJs need not discuss each factor in their written decisions, but they commit legal error if their decisions about weighing medical opinions lack substantial evidentiary support. See Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) ("Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record.") (citation omitted).[5]

Here, it appears that Dr. Lay treated Plaintiff at the Phoenix Clinic. In April 2016, she was willing to complete the functional questionnaire. AR AR 413-14. In May 2016, she authorized a 5150 hold and referred him to Arrowhead where Dr. Pham agreed that he was a danger to self and admitted him for 10 days. AR 531,

---

[5] Effective March 27, 2017, the Social Security Administration changed its rules for evaluating medical evidence. See Revisions to Rules Regarding Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5845 (Jan. 18, 2017). Plaintiff and Defendant agree that the old rules apply here, however. (JS at 9 [Plaintiff's citations to precedent from 1995]; id. at 12 n.1 [Defendant's reasoning that Plaintiff's application for benefits was filed prior to March 27, 2017].)

540-41.

The Court did not see – and the parties did not cite – any treating records from the Phoenix Clinic in the AR. Due to the lack of records, the ALJ correctly concluded that it is "unclear" how long Dr. Lay had a treating relationship with Plaintiff. It is similarly unclear, however, which treating doctor had the best longitudinal view of Plaintiff's mental health, because the manner in which he sought treatment (i.e., frequent visits to the ER) caused him to obtain treatment from many different medical sources.

The ALJ also correctly concluded that Dr. Lay did not explain her opinions in the questionnaire. Her opinions, however, have some degree of consistency with Plaintiff's treating records and even the RFC determined by the ALJ. For example, both Dr. Lay and the ALJ determined that Plaintiff could do simple tasks but had trouble traveling to new places. AR 20-23, 414.

Ultimately, the Court does not decide whether the ALJ erred in evaluating Dr. Lay's opinion because other legal error, discussed below, requires remand.

        b.     RFC.

Plaintiff argues that the RFC determined by the ALJ does not adequately account for the functional limitations caused by Plaintiff's mental impairments. (JS at 9-11.) The ALJ found that Plaintiff has moderate difficulty maintaining concentration, persistence, and pace. AR 20. The RFC, however, does not restrict Plaintiff against working in a fast-paced environment. AR 21. To the contrary, the one job that is not inconsistent with "simple" work (i.e., the electronics worker position) involves assembly tasks, per the DOT.

Courts have held that a step two finding of a moderate limitation in the ability to maintain persistence or pace is not necessarily accommodated by within a limitation to simple, routine, and repetitive tasks. Lee v. Colvin, 80 F. Supp. 3d 1137, 1151 (D. Or. 2015). In unpublished opinions, the Ninth Circuit has held that when ALJs find a moderate limitation in concentration, persistence or pace, they

must accommodate that limitation in a claimant's RFC. See Lubin v. Comm'r of Soc. Sec. Admin., 507 F. App'x 709, 712 (9th Cir. 2013) (clarifying that limiting a claimant to "one to three step tasks" did not capture a concentration, persistence or pace deficiency); Williamson v. Comm'r of Soc. Sec., 438 F. App'x 609, 611 (9th Cir. 2011). Similarly, as noted by the Ninth Circuit in Brink v. Comm'r Soc. Sec. Admin., 343 F. App'x 211 (9th Cir. 2009) – a case relied on by the district court in Lee – although the ALJ had accepted the claimant's moderate restrictions as to concentration, persistence, and pace, the ALJ failed to address these specific restrictions in the claimant's RFC and in his hypothetical questions, suggesting only a restriction to "simple, repetitive work." Brink, 343 F. App'x at 212. The Ninth Circuit found that this restriction did not adequately capture the claimant's moderate restrictions as to concentration, persistence, or pace, because the repetitive assembly-line work addressed by the vocational expert might also require extensive focus and speed. Id.; see also Lubin, 507 F. App'x at 712 (finding the ALJ erred by accepting that the claimant had limitations as to concentration, persistence, or pace and then failing to include such limitations in the RFC and the hypothetical questions to the vocational expert, which only limited the claimant to one- to three-step tasks).

Relying on Brink and Lubin, courts in the Central District have remanded cases where: (a) the claimant had "moderate" limitations in maintaining concentration, persistence, and pace, (b) the RFC included only a limitation to "simple" work, and (c) the VE testified that the claimant could work as an electronics worker. See, e.g., Cruz v. Colvin, No. 12-1143-JPR, 2013 U.S. Dist. LEXIS 114392, at *28-29, 2013 WL 4082714 (C.D. Cal. Aug. 13, 2013); Stevens v. Astrue, No. 12-3629-RNB, 2013 U.S. Dist. LEXIS 12808, at *6, 2013 WL 361100 (C.D. Cal. Jan. 30, 2013); see also Alva v. Colvin, No. 16-253-PLA, 2016 U.S. Dist. LEXIS 152907, at *15-16, 2016 WL 6561452 (C.D. Cal. Nov. 2, 2016) (remanding where VE testified that claimant could work as a fast-food worker).

For these reasons, the ALJ erred in not restricting Plaintiff against fast-paced work. The Court cannot conclude that the error was harmless, because a restriction against fast-paced work may significantly erode the number of electronics worker jobs available. Remand for further proceedings, rather than remand for an award of benefits, is appropriate because it is not clear from the record that Plaintiff is entitled to benefits. See <u>Garrison v. Colvin</u>, 795 F.3d 995, 1019 (9th Cir. 2014); <u>Treichler v. Comm'r of Soc. Sec. Admin.</u>, 775 F.3d 1090, 1103-04 (9th Cir. 2014).

## IV.
## CONCLUSION

For the reasons stated above, IT IS ORDERED that the decision of the Social Security Administration is reversed, and this matter is remanded for further proceedings consistent with this Opinion.

DATED: <u>June 12, 2019</u>

_____
KAREN E. SCOTT
United States Magistrate Judge